**Phyllis Y. COOPER, Plaintiff,**

v.

**Major General Robert A. ROSENBERG, in his official Capacity as Director and Head of Defense Mapping Agency Aerospace Center, Defendant.**

**Cause No. 85–77–C(4).**

United States District Court,
E.D. Missouri, E.D.

Oct. 16, 1987.

Thomas E. Dittmeier, U.S. Atty., E.D. Mo., Edwin B. Brzezinski, Asst. U.S. Atty., Howard S. Bishop, Jr., Asst. Gen. Counsel, Defense Mapping Agency, St. Louis, Mo., for defendant.

Edward L. Welch, Edwardsville, Ill., Charles R. Oldham, St. Louis, Mo., for plaintiff.

## MEMORANDUM, ORDER, AND JUDGMENT

CAHILL, District Judge.

This matter is before the Court for a decision on the merits following a trial to the Court of plaintiff's claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*

Plaintiff, Phyllis Cooper, alleges that defendant, in his official capacity, discriminated against her by promoting a white female to the position of Budget Analyst instead of plaintiff. In addition, plaintiff challenges the process by which the Defense Mapping Agency Aerospace Center (DMAAC) promoted the white female. Plaintiff seeks injunctive relief, back pay, and costs and attorneys fees.

After consideration of the testimony and exhibits introduced at trial, the parties' briefs, and the applicable law, the Court hereby makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact.

1. Plaintiff Phyllis Cooper is a black female citizen of the United States and at all times relevant was a resident of St. Louis County, Missouri.

2. Plaintiff is employed by the Defense Mapping Agency Aerospace Center (DMAAC).

3. The Defense Mapping Agency Aerospace Center is a component of the Defense Mapping Agency, an agency of the Government of the United States, with its principal facilities in St. Louis, Missouri.

4. Defendant Major General Robert O. Rosenberg is the Director and Head of DMAAC, and is sued in his official capacity.

5. On or about March 24, 1982, DMAAC announced that employees could apply for a vacant Budget Analyst position, GS–560, which would be filled under DMAAC's Upward Mobility Program (UMP).

6. The vacant Budget Analyst position was located in the Program/Budget Division of the DMAAC's Comptroller's office. The announced vacancy could be filled at either the GS–5 or GS–7 grade level and the person selected could be noncompetitively promoted ultimately to the GS–11 grade level after gaining sufficient experience and performing satisfactorily.

7. The UMP is a program aimed at promoting employees who have excellent work records, but who would not ordinarily be eligible for promotion because of an absence of the education or experience requirements necessary to qualify for a higher-graded job.

8. Plaintiff applied for the position of Budget Analyst in a proper and timely manner.

9. Plaintiff was not hired for the position of Budget Analyst. Ms. Louise Calloway, a white female, was hired to fill the Budget Analyst vacancy.

10. The procedure for applying for the Budget Analyst position required that each applicant be evaluated and ranked by the DMAAC personnel. Following that evaluation, certain candidates were chosen as the "best qualified" applicants. Under DMAAC regulations, the "best qualified" candidates are referred by the personnel office to the selecting official. The select-

ing official makes the final determination as to who will fill the vacancy. The selecting official's decision then must be approved by an approving official.

11. The selecting official for the vacant position of Budget Analyst was Mr. Harold Lewis, the Chief of the Program/Budget Division of the Comptroller's office, because Mr. Lewis (a white male) is the first-line supervisor of the Budget Analyst.

12. Mr. Lewis selected Ms. Calloway for the Budget Analyst position. Both plaintiff and Ms. Calloway had been rated as "best qualified" for the position.

13. Ms. Calloway was Mr. Paul Morton's secretary at the time she applied for the position.

14. Mr. Paul Morton, the Comptroller, was also Mr. Lewis' supervisor and as such he was the approving official for Mr. Lewis' selection of Ms. Calloway as the Budget Analyst. Mr. Morton approved Mr. Lewis' selection of Ms. Calloway.

15. Mr. Morton pre-selected Ms. Calloway to fill the vacant position of Budget Analyst. Testimony also indicates that Ms. Calloway knew that she would be chosen to fill the vacant Budget Analyst position prior to the release of the vacancy announcement.

16. Prior to the vacancy announcement, Mr. Morton authorized Ms. Calloway's attendance at a Budget Accounting training session although Ms. Calloway did not hold a job in the budget field and was not in the required 560 or 561 classification for attendance.

17. Mr. Morton approved the request for targeting the position of Budget Analyst as one under the UMP approximately seven months prior to the release of the announcement.

18. Prior to the interviewing process for the Budget Analyst position, Mr. Morton also wrote a 2-1/2 page single spaced typed letter praising Ms. Calloway and added it to her personnel file two months prior to her interview for the Budget Analyst position.

19. On or about August 20, 1982, plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC).

20. On or about January 15, 1985, plaintiff filed this complaint.

*Conclusions of Law.*

■ This Court has jurisdiction pursuant to 42 U.S.C. § 2000e–16. On the merits of this case, the Court finds that defendant discriminated against plaintiff on the basis of her race.

Plaintiff has made a prima facie case of racial discrimination by showing that she is black; she was qualified for the position for which she applied; she was rejected for the position; and the employer hired a white employee for that position. *See McDonnell Douglas v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973); *Love v. Special School District of St. Louis County,* 606 F.Supp. 1320 (1985). Once plaintiff has established a prima facie case of discrimination, the defendant must articulate legitimate, non-discriminatory reasons for bypassing plaintiff in favor of the other applicants. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576–580, 98 S.Ct. 2943, 2949–2951, 57 L.Ed.2d 957 (1978); *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978). Then, the plaintiff must show by a preponderance of the evidence that the legitimate reasons offered by the defendant were pretextual. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. And the burden of proof remains with the plaintiff at all times. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 10; *Board of Trustees of Keene State,* 439 U.S. at 25 n. 2, 99 S.Ct. at 296 n. 2.

In this case, the Court finds defendant's explanation highly implausible. It is clear to this Court that Mr. Morton's conduct and decisions affected plaintiff in a discriminatory manner. Mr. Morton was in a key position of authority which enabled him to carve out the character of the Comptroller's office and its personnel needs in a

i

manner that favored his candidates. While Mr. Morton's actions, if viewed in isolation, may not appear to be discriminatory, it is the totality of the conduct and the attending circumstances that make the discrimination unquestionable. The Court finds particularly egregious the Comptroller's deliberate preparation and "grooming" of Ms. Calloway, his secretary, to enter the Budget Analyst position. Morton began preparing Ms. Calloway as far back as December 1981, four months prior to DMAC's issuing the announcement for the Budget Analyst vacancy, when he signed a special authorization for Calloway to take a budget training course for which she did not qualify on her own merit. Furthermore, the conversation between Ms. Cracchiola and Ms. Calloway indicated that Ms. Calloway knew that Mr. Morton had targeted her for the Budget Analyst position. The letter Morton wrote and placed in Calloway's file was more than a documentation of her duties. It appeared to be a personal testimonial to Calloway rather than a mere job description. (Plaintiff's Exh. 6.) The content of the letter addressed all the qualities that would be closely scrutinized by the selecting official during his search for a Budget Analyst. This letter was placed in Ms. Calloway's file two months prior to her interview. Plaintiff was interviewed for approximately one hour and Ms. Calloway was interviewed for ten minutes. Finally, Mr. Lewis, one of Mr. Morton's subordinates, was the selecting official for the Budget Analyst position. Mr. Morton denies any involvement in Mr. Lewis' decision, but the evidence is overwhelming that Mr. Lewis could do little more than follow Mr. Morton's direction.

The leading case on disparate impact is *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In that case, the United States Supreme Court found that the examinations used for selecting employees had a disproportionate impact on minorities. In a disparate impact case, the plaintiff must show (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two. *McIntosh v. Weinberger*, 810 F.2d 1411, 1427 (8th Cir.1987), *citing Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 189 (5th Cir. 1983). This Court believes that plaintiff has met this burden and that the discriminatory impact of Mr. Morton's policies are clear.

In today's world discrimination takes forms more subtle than in earlier years. Because it is subtle it is no less real or pernicious. It requires an unceasing effort to eradicate racial injustice. The effects of these sophisticated forms of discrimination are often as "cruel and devastating as the crudest form of discrimination." *Commonwealth of Pennsylvania, et al. v. Local 542, Int'l. Union of Operating Engineers*, 469 F.Supp. 329, 337 (E.D.Pa.1978). The facts as presented to this Court demonstrate the "complexity and subtlety of the interrelationship of race ... and the employment process." *Commonwealth of Pennsylvania* at 337. Historically whites have always held the most desirable positions. There have been "intentional and persistent efforts to exclude and discourage" most others. *Commonwealth of Pennsylvania, supra.* Those others have been minorities who but for their race, religion, or ethnicity would have been given equal and fair consideration for these lucrative jobs. This case is a clear example of such exclusion and discouragement.

Comptroller Morton, a white, consistently placed his friends and relatives in the better positions in his department. He chose them from a group that historically, and from its own innate nature, excluded blacks. Then, his advance information enabled him to favor his own choices, all of whom were selected from a group always closed to plaintiff, thus perpetuating discrimination. While there may have been no specific intention to discriminate because of race, the end result still had a disparate impact on racial minorities. These practices, coupled with the personal lobbying by Mr. Morton in behalf of his secretary, made the racially neutral patterns and procedures ineffectual.

*Retaliation.*

■ The Eighth Circuit has held that in order to establish a prima facie case of retaliation, the plaintiff has to show that (1) she engaged in a protected activity; (2) that adverse employment action occurred; and (3) that there is a causal connection between the first two prongs of the inquiry. *Jackson v. Missouri Pacific R.R. Co.*, 803 F.2d 401, 406–7 (8th Cir.1986), *citing Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). In the instant case, plaintiff has shown that she engaged in a protected activity in the filing of her Equal Employment Opportunity Commission (EEOC) complaint and that adverse employment actions occurred in that her position was upgraded but she was not allowed to occupy the higher position, among other things. Thus, plaintiff has met the first two prongs of the inquiry. However, the Court finds that plaintiff has not established a causal link between the first two prongs of the inquiry and therefore has not satisfied the third prong of the inquiry. Defendant has offered justification for the actions taken. Under these circumstances, this Court cannot find that defendant's actions were retaliatory. Accordingly, the Court will enter judgment for the defendant on the issue of retaliation.

*Damages.*

■ It is within the Court's discretion to award back pay upon a finding of an unlawful employment practice. *See* 42 U.S.C. § 2000e–5(g). Under Title VII, a district court awards back pay in order to put the discrimination victim in the position she would have occupied if the defendant had not discriminated against her. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In addition, if there is a finding of discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination. *Albemarle* at 421, 95

S.Ct. at 2373. Consequently, this Court will award plaintiff back pay.

The Court of Appeals for the Fourth Circuit addressed the issue of how long should back pay last in *E.E.O.C. v. Ford Motor Co.*, 645 F.2d 183 (4th Cir.1981), and affirmed the district court's calculation of back pay from the time the plaintiffs applied for the job to the trial date. That court hypothetically constructed the employment history of the claimants, calculated what they would have earned if they had not been the victims of discrimination, subtracted what they actually earned during the period, and awarded the difference in back pay. *E.E.O.C. v. Ford*, at 191. *E.E.O.C. v. Ford* was a sex discrimination case in which plaintiffs alleged Ford had violated Title VII in its hiring practices at a parts warehouse in North Carolina. Therefore, pursuant to 42 U.S.C. § 2000e–5(g), *Albemarle Paper Co.*, and *E.E.O.C. v. Ford*, this Court will exercise its discretion and award plaintiff the difference between the wages she actually earned and the wages she would have earned if she had received the promotion with the attendant salary increases. According to plaintiff's calculations, the difference in pay between the wages she received in the grade and step she actually was and the grade and step she could have been but for the discrimination amounted to $29,201.60. Therefore, the Court will award plaintiff that amount as damages. However, if either party believes that clarification is needed or necessary, the Court will entertain timely motions to amend its order.

The Court will also order defendant to place Ms. Cooper, within 30 days, in the next available UMP position for which she is qualified (at a GS–9 grade) with the opportunity for advancement commensurate with her experience and abilities. If after 30 days a GS–9 position is not available, defendant must then increase plaintiff's salary to a GS–9 level which reflects a two-grade salary increase. The Court will also award plaintiff her costs and attorney's fees. Plaintiff's attorney is directed to submit to the Court a brief and

**1382**

affidavit itemizing his fees and costs. Accordingly,

IT IS HEREBY ORDERED, adjudged and decreed that judgment be and is entered in favor of the plaintiff and against the defendant on Count I of her second amended complaint;

IT IS FURTHER ORDERED, adjudged and decreed that judgment be and is entered in favor of defendant and against plaintiff on Count II of her second amended complaint;

IT IS FURTHER ORDERED, adjudged and decreed that plaintiff is hereby awarded $29,201.60 in back wages;

IT IS FURTHER ORDERED, adjudged and decreed that plaintiff be promoted when the next available UMP vacancy for which she is qualified occurs, to a grade GS–9. If no such vacancy occurs within 30 days, defendant must increase plaintiff's salary to a GS–9 level which reflects a two-grade salary increase.

IT IS FURTHER ORDERED, adjudged and decreed that plaintiff is awarded her attorneys' fees and costs.