**Larry IVY, Donnie Ruffin, Henry Naylor, Gus Blanks, Robert Sims, Robert Owens, Dorse Stribling, Individually, And As Count II, On Behalf of All Others Similarly Situated, Plaintiffs,**

v.

**MERIDIAN COCA–COLA BOTTLING COMPANY, Defendant.**

Civ. A. No. E84–0022(L).

United States District Court, S.D. Mississippi, E.D.

June 3, 1986.

Alison Steiner, Andalman, Adelman & Steiner, P.A., Hattiesburg, Miss., for plaintiffs.

James D. Carriere, Michael W. Lord, Charles A. Adams, Jr. and Robert Spencer, Kullman, Inman, Bee & Downing, New Orleans, La., for defendant.

## MEMORANDUM OPINION

TOM S. LEE, District Judge.

This cause came before the court for trial on plaintiffs' complaint alleging classwide and individual claims of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. The liability and damages aspects of this action were bifurcated, and a six-day trial was conducted on the issue of liability wherein plaintiffs offered proof on both their class and individual claims. Following review of the evidence adduced at the bench trial, the court makes the following findings of fact and conclusions of law.

Plaintiffs are all black adult residents of Mississippi, residing in and around Meridian, Mississippi. The defendant, Meridian Coca-Cola Bottling Company (Company or Meridian Coke), is a Mississippi corporation doing business and having its chief executive offices in Meridian, Mississippi. The Company and its wholly owned subsidiary, C.C. Coin Caterers Company (hereinafter referred to as the "Company" unless designated separately as "Coin Caterers"), constitute an employer within the meaning of Title VII.

On July 22, 1982, the Meridian Branch of the NAACP filed a third-party charge of discrimination (class charge) against the Company with the Equal Employment Opportunity Commission (EEOC). This class charge alleged that the Company maintained a pattern and practice of discriminatory treatment of present and former black employees in violation of Title VII. The named plaintiffs later filed "third party certificate[s] of charge" with respect to the class charge, and this action has been pursued with these plaintiffs as the proposed class representatives. The EEOC conducted an extensive investigation into the class charges and, on August 8, 1983, issued a determination letter finding that "reasonable cause exists to believe Respondent [Company] discriminates against its black employees as a class." Plaintiffs received their right-to-sue letter from the EEOC on August 27, 1984.

Subsequent to the filing of the class charge with the EEOC but prior to the issuance of the determination letter, plaintiffs Donnie Ruffin, Henry Naylor, Gus Blanks and Larry Ivy were terminated from their employment by the Company. On November 23, 1982, the Meridian Branch of the NAACP filed a second third-party charge of discrimination against the Company with the EEOC, alleging therein that these plaintiffs had been discharged in retaliation for their participation in the class charge.[1] A no-cause letter was issued regarding the retaliation charge, and the EEOC issued a right-to-sue letter on this charge on November 10, 1983. The original complaint in this cause, alleging

---

1. Plaintiff Naylor filed an individual charge with the EEOC, alleging racial discrimination in his termination, on October 27, 1982. Plaintiff Ivy filed a similar charge on November 20, 1982. These claims were dismissed from this action by order of this court granting defendant's motion for partial summary judgment. *Ivy v. Meridian Coca-Cola Bottling Co.*, 108 F.R.D. 118, 124–27 (S.D.Miss.1985).

retaliatory discharge of these plaintiffs, was timely filed on February 7, 1984. The complaint was amended on October 3, 1984 to add the class claims.

On October 30, 1985, the court certified a class in this cause composed of the following:

> All black persons who have at any time from February 22, 1982 through the date judgment is entered in this case, been employed by Defendant Meridian Coca-Cola Bottling Company in any of its operations and who are in any way affected by any one or more of the following aspects of Defendant's employment practices: pay, job placement and assignment (including racially segregated job classifications), promotion (including practices which may deter the seeking of promotions), discipline (including termination of employment for disciplinary reasons) quality of work environment with reference to use of racially derogatory language, and subjective decision making by Defendant relative to the above enumerated terms and conditions of employment.

*Ivy v. Meridian Coca-Cola Bottling Co.,* 108 F.R.D. 118 (S.D.Miss.1985).

The court notes at the outset that the class certification in this cause was limited to discriminatory or disparate treatment of black employees occurring while the class members were employed at the Company. No class claims were advanced by plaintiffs respecting alleged discrimination in hiring practices, and the class certification opinion clearly precludes consideration of Company termination practices as part of the class claims. *Id.* at 124 n. 16. Thus, to the extent that the definition of the certified class quoted above includes those individuals who were terminated from employment for disciplinary reasons, as evidence of racial discrimination in the Company's method of disciplining employees, that portion of the class is decertified. All claims regarding termination of employees were pursued and are reviewed herein on an individual basis.

## ORGANIZATIONAL STRUCTURE OF THE COMPANY

Meridian Coca-Cola Bottling Company is in the business of bottling and distributing the various soft drink products offered under the Coca-Cola name. Presently, the Company operates out of a single plant and distribution center located in Meridian, Mississippi, which services an area within an approximate fifty-mile radius of Meridian. Coin Caterers, the Company's subsidiary, operates out of the Meridian plant and provides vending services to coin-operated, snack-food machines owned by the Company and manual service lines for industrial and institutional customers of the Company. Between February 1982 and December 1985—the relevant class period for which employment statistics are available—the Company employed a total of 284 non-temporary employees in its combined operations, of which approximately one-half were black. On any given day during the class period, the Company had on its payroll of permanent employees between 175 to 200 persons, of whom approximately forty to fifty percent were black. As of December 30, 1985, the Meridian Coke operation, excluding Coin Caterers, employed a total of 143 employees, seventy-three blacks and seventy whites. On the same date, Coin Caterers employed thirty-five persons, fourteen blacks and twenty-one whites. The Meridian Coke operation is divided for payroll purposes into seventeen different departments. Functionally, however, there are four main sections: operations, route sales, sales service and administration. Company employment practices within the administrative section—including clerical, office, data processing and upper-management personnel—are not challenged in this litigation and will not be discussed further.

The operations section consists of those employees who participate in the actual manufacturing and bottling of soft drinks on the production line. The production line employees comprise what is commonly referred to as the production department. Also included in the operations section are

those who participate in shipping and receiving functions, loading and sorting, and vehicle maintenance functions in the Company garage. Larry Cleveland, a white male, is the operations manager. In the production department, two supervisory positions exist: maintenance supervisor and production supervisor. William Rester, a twenty-four-year old white male who started with the Company in January 1981, holds the position of maintenance supervisor. Ernest Randall, a twenty-seven-year old white male who started with the Company in March 1980 and is Cleveland's son-in-law, holds the position of production supervisor. In the load-sort department, there is a white loading crew supervisor, Keith Kinney, and a black assistant supervisor, James Colston.[2] In the garage department, James Caldwell, a white male, is fleet manager, assisted by two white mechanics and one black mechanic. The shipping and receiving department has only four employees, two white clerks, John McArthur and Tommy Robinson, and two black forklift drivers, Cleotis Stevenson and T.J. Cox. All the above-named supervisors report directly to Larry Cleveland. Except for these supervisors and the shipping clerks, all operations employees are paid hourly wages. As of December 30, 1985, there were forty-five full-time employees in the operations section, thirty-two of whom were black. It is to be noted that five of the seven named plaintiffs representing the class in this cause worked or presently work in the production department. Named plaintiffs Robert Sims and Robert Owens have tenures with the Company exceeding fifteen years each, yet neither has ever held a position above that of machine operator on the production line.

The route sales section performs sales and delivery functions throughout the area serviced by the Company. Tommy Duncan, a white male, is sales manager. Four white area managers and a white account manager operate under Duncan. This constitutes the sales supervisory staff. There has never been a sales supervisory position filled by a black during the class period or before. Each area manager oversees the functions of some five to seven route salesmen. Route salesmen take orders from customers and deliver drinks pursuant to the orders. As of December 30, 1985, there were twenty-three white route salesmen—including extra route salesmen who fill in for absent regular salesmen—and four black route salesmen. Each route salesman has working with him a route sales helper, whose job it is to perform the physical labor involved in delivering and loading the product on sales calls. As of December 30, 1985, there were twenty-nine route sales helpers—including extra sales helpers who fill in for absent helpers—all of whom were black. All helpers and extra helpers are paid hourly wages. Over the class period there have been a total of forty-seven route and extra route salesmen employed by the Meridian Coke operation, five of whom were black. Over the same period, the Meridian Coke operation has employed a total of fifty-seven route sales and extra sales helpers, forty-nine of whom were black.

The sales support section has the responsibility of handling product distribution other than through route sales and provides maintenance and delivery of soft drink vending machines. The sales support section is divided into two main departments, cooler repair and delivery, supervised by cooler service manager Jack Mayatt, a white male, and three departments known as special events, advertising and sales, which are under the supervisory authority of the sales manager, Tommy Duncan. Presently, there are seven cooler repairmen working under Mayatt, one of whom is black. Two blacks and no whites presently perform the cooler delivery function. The special events department provides "post-mix" soft drinks for concession sales or other special events. Statistics reveal that one white and one black presently perform

**2.** James Colston was employed by the Company on August 21, 1979 and assigned the position of forklift operator. He was promoted to assistant supervisor in the load-sort department in May 1984, some months after the original complaint in this suit was filed.

the special events function. The advertising department physically maintains billboards and other advertising structures in the area. Two whites currently perform sign maintenance. Sales delivery department personnel deliver bulk and special orders of soft drinks, as distinguished from the merchandizing function of the route salesmen, with a staff composed of two whites and two blacks.

Coin Caterers is a separate and distinct entity from Meridian Coke. It is headed by manager Sam Lindley, a white male, under whose supervision are two accounts managers, one white and one black. Additionally, five white females presently serve as hostesses in the manual-service function of Coin Caterers.

In both the Meridian Coke and Coin Caterers operations, supervisors and managers report to two individuals that comprise the top management of the Company: President Hardy Graham and Secretary-Treasurer Richard James, both white males. While Graham and James vest day-to-day supervision of employment and personnel decisions with the individual department heads at the Company, it is undisputed that they maintain ultimate power of review over every decision made within the Company respecting employment practices.

Beginning in the fall of 1982, the Company undertook to implement a reorganization plan recommended by Profit Management Development, Inc. (PMD), a professional consulting firm. Contact with Hardy Graham was initiated by PMD in the spring of 1982, and, upon Graham's acceptance of the PMD proposal, a study of plant operations was conducted by Leo Garibay of PMD through the late summer and fall of 1982. The product of Garibay's study was a report recommending certain changes in the corporate structure and the utilization of manpower within the Company. The Company's partial implementation of the PMD recommendations in late 1982 and 1983 and the resulting shake-up in the work force led to many of the disputes at issue in this litigation.

## MOTION TO DECERTIFY CLASS

■ At the close of plaintiffs' case, the Company moved to decertify the class on grounds that the numerosity requirement of Rule 23 of the Federal Rules of Civil Procedure could not be satisfied by plaintiffs' proof. In the alternative, the Company moved to limit the class to exclude those departments as to which there was no specific testimony regarding racially discriminatory conditions or employment practices, including Coin Caterers and the administration and advertising departments. The motion was renewed at the conclusion of defendant's case. Citing *Williams v. Tallahassee Motors, Inc.*, 607 F.2d 689 (5th Cir.1979), the Company argued that the statistical evidence adduced by plaintiffs should be disregarded because the actual number of employees to be considered in arriving at a proper sample size is too small to provide a statistically sufficient data base. The Company further argued that there were only forty-two actual promotions granted by the Company during the class period, together with some thirty discharges. Thus, the Company concluded, the statistical evidence of underrepresentation of blacks in supervisory or other upper-level positions within the Company should be limited to an analysis of these individuals who were qualified for promotion to only these forty-two positions, which would provide such a small sample size that adding or subtracting one employee would substantially alter the standard-deviation analysis. The Company concluded that using such a small sample size would also increase the likelihood that any underrepresentation reflects chance rather than discriminatory practices. The court rejects the Company's contentions on two grounds: the numerosity requirement of Rule 23 focuses on whether joinder of all class members in one suit is practicable rather than on any asserted "magic" number of class members; [3] the proper pool for

---

**3.** See the discussion of the numerosity element in this court's Memorandum Opinion and Order

certifying the class in this cause, *Ivy v. Meridian*

statistical analysis of promotions in this class action, as discussed *infra,* is the entire workforce at the Company during the class period. As plaintiffs have alleged class-wide discrimination in promotion practices which result in the concentration of black employees in lower-level positions within the Company, the fact that plaintiffs adduced no specific evidence of discrimination in certain departments from which they were excluded does not require that those departments be removed from consideration. Therefore, the Company's motion to decertify or otherwise limit the class is overruled.

## CLASS CLAIMS

■ A Title VII case may be pursued under two theories: disparate impact and disparate treatment. Facially neutral practices which effect a more severe impact on a particular group are subject to attack under the disparate impact theory. *See Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). In a disparate treatment case, the plaintiff must prove the existence of discrimination and, unlike a disparate impact case, discriminatory animus. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

Defendant contends that plaintiffs' case is one of disparate treatment and not disparate impact. Plaintiffs' class claims focus primarily on defendants' lack of objective standards for making job decisions. Richard James, the Company's Secretary-Treasurer, testified that the Company has no written requirements for initial employment or promotion. He contended, however, that objective criteria do exist and recited aggressiveness, self-motivation and neatness as examples of such qualifications. He did state that a request for promotion[4] or a certain number of years with the Company are not prerequisites for promotion. When a vacancy exists, the

department supervisor recommends a person to Hardy Graham, who inquires as to that person's qualifications as well as the qualifications of others in the department. The discussion focuses on recollections of various employees since personnel files do not contain regular written evaluations. During the class period all those people with input in promotion decisions were white. No official announcements of vacancies are made; the defendant instead relies on the Company grapevine to spread the word. Decisions regarding pay are made by Graham who testified that he considers industry standards, which were not explained at trial.

In *Pegues v. Mississippi State Employment Service,* 699 F.2d 760, 765 (5th Cir. 1983), the plaintiffs charged *inter alia* that the defendant exercised excessive discretion in classifying and referring applicants for jobs. The Fifth Circuit stated:

Because the classification and referral practices complained of effectively turn on discretionary decisions, they do not fall within the category of facially neutral procedures to which the disparate impact model is traditionally applied. *Pouncy v. Prudential Insurance Co.,* 668 F.2d 795 (5th Cir.1982); C. Sullivan, M. Ziller and R. Richards, Federal Statutory Law of Employment Discrimination, § 1.5(c)(1980). Selection processes which rely on subjective judgments, despite the corralling by objective standards, provide the opportunity for the intentional discrimination cognizable in a disparate treatment action. *See Payne v. Travenol Laboratories, Inc.* [673 F.2d 798 (5th Cir.), *reh'g denied,* 683 F.2d 417 (5th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982)]. We must therefore analyze plaintiffs' challenge to the classification and referral system under the disparate treatment modality.

*Pegues,* 699 F.2d at 765.

In *Page v. U.S. Industries, Inc.,* 726 F.2d 1038 (5th Cir.1984), the Fifth Circuit indi-

*Coca-Cola Bottling Co.,* 108 F.R.D. 118, 121–22 (S.D.Miss.1985).

4. It should be noted, however, that in testimony of defendant's witnesses regarding plaintiffs, self-motivation was apparently equated with a request for promotion.

cated that a subjective promotional system that incorporates facially neutral and objective criteria can be properly analyzed under both the disparate impact and disparate treatment models. *Id.* at 1046. While *Page* appears to depart from *Pouncy* and *Pegues*, the employer in *Page* used, at least to some extent, job classifications which were set out in a collective bargaining agreement for determining promotions. Although the existence of the job descriptions did not eliminate the subjectiveness of the challenged employment practice, it did inject an element of objectivity into the promotion process sufficient to constitute a facially neutral employment practice necessary for application of the disparate impact model. *Id.* at 1054. In this case, plaintiffs have not identified a facially neutral employment practice or any specific procedure utilized by the Company in making employment decisions. Plaintiffs challenge the Company's use of *wholly* subjective criteria which remain vague and substantially undisclosed to the black employees. Such challenge establishes, in its essence, an intentional disparate treatment claim. *Cf. Castaneda by Castaneda v. Pickard,* 781 F.2d 456, 465 n. 11 (5th Cir.1986). Therefore, the court concludes that the disparate impact model is inapplicable to this case, and plaintiffs' class claims will be analyzed under the disparate treatment model.

To establish disparate treatment, plaintiffs must prove that defendant acted with discriminatory intent and that "discrimination was the [defendant's] standard operating procedure—the regular rather than the unusual practice." *Carroll v. Sears, Roe-*

*buck & Co.,* 708 F.2d 183, 190 (5th Cir. 1983). *See Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1854. Plaintiffs may make their prima facie case with statistics if a "gross disparity" in the treatment of workers based on race is shown.[5] *Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). Such a disparity may justify an inference of discrimination and may be buttressed with evidence of history, individual instances of discrimination and opportunity to discriminate in the decision making process. *Payne,* 673 F.2d at 817. Once the plaintiffs make a prima facie case, defendant, in order to prevail, must discredit the evidence or provide nondiscriminatory reasons for the apparently discriminatory results. *Carroll,* 708 F.2d at 190.

1. *Discrimination in Promotion*

██ Plaintiffs' expert, Dr. Jerry Himelstein, prepared tables comparing the observed and expected numbers of blacks in various positions.[6] Workers in the operations section of the Company do primarily physical labor such as sorting bottles, placing bottles on the line and operating machinery, and are paid hourly wages. Himelstein's table 3 shows that the difference between the observed and expected numbers of blacks in operations between 1982 and 1985 was 3.91 standard deviations below the mean. The tables also reflect that in the sales department blacks were concentrated in helper positions during that time whereas whites occupied most of the salesmen jobs.[7] Himelstein's tables show that from 1982 to 1985 the difference be-

---

5. Statistical evidence is not without limits. This court heeds the caution of the United States Supreme Court "that statistics are not irrefutable; they come in infinite variety and like any other kind of evidence, their usefulness depends on all the surrounding facts and circumstances." *Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1856. The Fifth Circuit counsels that "a district court, in assessing statistical presentations in Title VII class actions, should 'accept what figures are available; allow for imperfections, skewing factors, and margins of error; and then take the figures for what they are worth.'" *Carroll,* 708 F.2d at 195 (quoting *Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1025 (5th Cir.1981)).

6. Himelstein computed the data over the period of 1982 to 1985 and as of December 30, 1985. The results were similar and the court refers only to the 1982–1985 tables. The December 30, 1985 data demonstrates that the situation of the Company has not changed significantly over the class period.

7. Only two of the four blacks who worked as route salesmen and extra route salesmen were salaried whereas all of the whites in those positions worked on a commission basis.

tween the observed and expected numbers of blacks in salesmen jobs was 5.48 standard deviations above the mean and that the difference between the observed and expected numbers of blacks in helper positions was 4.54 standard deviations below the mean. Himelstein's tables also show that few blacks occupied supervisory positions, the difference between observed and expected blacks in these jobs being 4.52 standard deviations above the mean between 1982 to 1985. Himelstein testified that all of these results indicate significant statistical disparity. Himelstein also performed hierarchical and step-wise multiple regressions using yearly earnings as the dependent variable and years of service and race as independent variables. He concluded that race was statistically significant at the .001 level.

In *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the United States Supreme Court addressed the definition, significance and methodology of determining standard deviation. According to the Court, the standard deviation quantifies the probability that chance is responsible for any difference between an expected outcome and the observed outcome in a sample comprised of protected and nonprotected groups. 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17. A fluctuation of two to three standard deviations indicates that the result is caused by discriminatory intent rather than chance. *See Hazelwood*, 433 U.S. 299, 312 n. 17, 97 S.Ct. 2736, 2743 n. 17, 53 L.Ed.2d 768 (1977); *Harrell v. Northern Electric Co.*, 672 F.2d 444, 447 (5th Cir.1982). Himelstein's statistics show standard deviations far in excess of the minimum set out in *Hazelwood*, thereby making a prima facie case of discrimination in promotion.

Dr. Arthur Levine, defendant's statistical expert, attempted to discredit Himelstein's statistics.[8] Levine opined that the figures do not address discrimination in promotion. In *Carroll*, where the defendant promoted primarily from within, as does the Company here, the Fifth Circuit stated: "Over time, the percentage of black employees in the upper level positions should correspond to the percentage of black employees in the work force as a whole if no discrimination is taking place." 708 F.2d at 192. Himelstein's data shows that blacks comprise approximately fifty percent of the work force at the Company and yet are concentrated in lower-level positions while supervisory and salesman positions are held primarily by whites. Therefore, an inference of discrimination in promotion is raised. Himelstein's statistics also demonstrate a significant disparity in pay between blacks and whites. That blacks are generally paid less indicates that they are concentrated in lower-paying jobs, further bolstering the inference of discrimination in promotion.

Levine also criticized the base line used by Himelstein. In the Fifth Circuit, the pool or base line should be tailored to "eliminate those whose exclusion from the positions in issue could be attributed to want of the requisite skills." *Rivera v. City of Witchita Falls*, 665 F.2d 531, 541 (5th Cir.1982). According to Levine, the plaintiffs' tables relied on the incorrect assumption that all employees are qualified for all jobs. Levine offered his own statistical tables regarding promotion wherein he limited the pools from which promotions were made in determining the observed and expected numbers of blacks to receive promotions. Levine's pools were limited to those positions from which people had actually been promoted and to other positions suggested by management.[9] From his analysis, Levine concluded that the difference between observed and expected was 1.6 standard deviations above the mean.[10]

---

**8.** Levine did not challenge the formulas used by Himelstein.

**9.** Levine also contended that any statistics regarding promotions were unreliable because the number of people eligible for promotions during the class period was so small. Levine's argument assumes that only certain people were qualified for those promotions, an assumption rejected by this court.

**10.** On cross-examination of Levine, counsel for plaintiffs noted several changes that should be made to correct the pools. When the changes

Levine's approach is fundamentally flawed. First, his position assumes that the Company has not discriminated and thereby sanctions continuation of whatever the Company has previously done. If the Company chooses positions held primarily by whites as the pool for promotions to a certain job, the expected number of blacks to be promoted will be few because the pool is primarily white. When a white is then promoted, the difference in observation and expectation will deviate only slightly from the mean, thus falsely indicating a lack of discrimination.[11] Second, it assumes that only persons who hold the pool positions are qualified for certain promotions. This assumption is belied by the Company's admission that it has no such job requirements. Accordingly, Levine's limitation of the pools is not proper.

Additionally, Himelstein's use of the work force as the pool is approved by the Fifth Circuit, which has held:

> The Company's entry level hiring policy is a distinctive circumstance in this case supporting the inference of discrimination. When a company adopts a policy and practice of hiring in at low-level unskilled jobs and promoting to upper-level [positions] based upon training received and skills developed at the plant itself, it cannot convincingly challenge the *prima facie* showing under the *Hazelwood* 'qualifications' dicta. Where skills are commensurate with the company training, we will approve statistical comparisons between racial make-up in key positions and racial composition in the total work force.

*Fisher v. Proctor & Gambell Manufacturing Co.*, 613 F.2d 527, 544 (5th Cir.1980). *See also Boykin v. Georgia-Pacific Corp.*, 706 F.2d 1384, 1392–93 (5th Cir.1983). Here, witnesses for the defendant stated that promotions are primarily from within the Company. The testimony further showed that the majority of qualifications which defendants' witnesses were able to articulate related to training or experience obtained on the job. Therefore, Himelstein's pool conforms with the legal requirements.[12] It should also be noted that the Company's practices foreclose standardization of qualifications because the appropriate standards can be neither accurately articulated nor applied.

Plaintiffs furthermore bolstered their prima facie case of promotion discrimination with other evidence. The Company has no written criteria for eligibility for promotions, vacancies are not posted and promotion decisions are based primarily on the opinions of supervisors, all but one of whom are white. In *Carroll*, the defendant had similar procedures and the Fifth Circuit held that they presented a great risk of discrimination and warranted strict scrutiny. *Carroll*, 708 F.2d at 192.

Plaintiffs' witnesses also testified to their individual experiences in the promotion process. Although defense witnesses testified to the existence of a Company grapevine which broadcast vacancies, it is apparent that blacks were not privy to such information. Plaintiffs' witnesses recounted several instances wherein they were not aware of vacancies until after they were filled. Donnie Ruffin testified that he expressed interest in moving from his extra helper position to a job as salesman but was told by Tommy Duncan that the public was not ready for a black salesperson. At least one white extra route salesperson was hired while Ruffin was an extra helper. The grapevine also was apparently used to spread the word regarding the Company's policy of paying the costs of certain college courses. Blacks were generally not aware of the policy until after it

---

admitted by Levine to be proper were made, the result approached 2 standard deviations above the mean. When all of plaintiffs' proposed alterations were made, the result was approximately 2.4 standard deviations above the mean.

**11.** Levine's conclusions must also be faulted because he apparently utilized varying time periods in determining the pools and numbers of promotions.

**12.** The Fifth Circuit has also held that a "perfect statistical model is not required." *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 653 (5th Cir.1983).

was posted in 1984 although whites regularly took advantage of the opportunity to obtain further education.

The most probative evidence regarding discrimination in promotion involved testimony of the speedy rise of two white males, Ernest Randall and Bill Rester, to supervisory positions in the operations department. Randall, hired in 1980, and Rester, hired in 1981, became supervisors sometime in 1984 even though they had less seniority than most of the other workers in the department, the majority of whom were black. None of the blacks who testified were aware of the vacancies or that they had been filled by Randall and Rester until long after the positions were filled. Larry Cleveland testified that Randall and Rester were promoted, in part, because they showed initiative in helping in the repair of broken machines. The testimony, however, showed that blacks sometimes volunteered to repair broken machines and always did so when requested. Cleveland also stated that only he could grant permission for an employee to do additional work. Both Randall and Rester furthermore benefited from educational programs to which the Company contributed, opportunities which were not made known to black employees. In summary, the Company was unable to articulate any nondiscriminatory reason whatever for the promotions of Randall and Rester.

Therefore, the court concludes that plaintiffs have established the liability of defendant in discrimination in promotion.

## 2. *Discrimination in Discipline*

■ Plaintiffs also contend that defendant discriminated against the class in disciplining employees. The Company has no established discipline policy providing work rules or grievance procedures. Supervisory personnel are apparently responsible for discipline of employees in their department although Graham at times participated in disciplinary action.

Plaintiffs contend that blacks in the production department were required to punch out on the time clock for lunch each day whereas Randall and Rester and other whites were not. The evidence showed that Randall and Rester often worked through their lunch period and did not punch out. They were not, however, paid for the lunch period, that time being subtracted in computing their pay. The evidence did not reflect that blacks were subjected to any discipline for failure to punch the time clock.

The evidence does show that reprimands to blacks were peppered with racial slurs and other derogatory language. Each witness for the plaintiffs testified that he or she had heard such statements made to themselves and others. While the court views the use of such language as corroborative of other evidence of discrimination, that language alone does not warrant a finding of discrimination in discipline.[13]

## 3. *Discrimination in Pay*

■ Plaintiffs further contend that defendant discriminates in pay decisions. In support thereof, plaintiffs offered statistical analyses indicating that the difference between the pay of blacks and whites is statistically significant. The analyses, however, compared all workers in the Company, regardless of position. While this information, as the court has previously stated, does indicate discrimination in promotion, it is not conclusive of discrimination in pay. *See also Payne*, 673 F.2d 827–28.

Salary decisions are made by Graham who stated that he relies on community and industry standards. Graham offered nondiscriminatory reasons for apparent disparities in pay, explaining that the differences were due primarily to experience, responsibility or transfers occasioned by reorganization. Plaintiffs' evidence regarding discrimination in pay is suggestive at best and

---

**13.** Plaintiffs also presented evidence regarding termination in support of their class claim of discriminatory discipline. As noted previously at page 3, such claims are not reviewed herein.

is not sufficient to support the class claim.[14]

## INDIVIDUAL CLAIMS

Plaintiffs Larry Ivy, Donnie Ruffin, Gus Blanks and Henry Naylor (individual plaintiffs) asserted at trial, in addition to their participation in the class claim, individual claims that they were discharged by the Company in retaliation for their joining in the original class charge of discriminatory employment practices filed with the EEOC by the Meridian Branch of the NAACP on July 22, 1982. Subsequent to the Company's receiving notice of the class charge on August 3, 1982, Ruffin was terminated on August 20, 1982, Naylor was terminated on October 25, 1982, Blanks was terminated on November 2, 1982 and Ivy was terminated on November 9, 1982. The Meridian Branch of the NAACP filed a third-party charge of discrimination against the Company on November 23, 1982, alleging therein retaliatory discharge of the individual plaintiffs. By determination letter dated November 10, 1983, the individual plaintiffs were informed that the EEOC found no reasonable cause to believe the retaliatory discharge allegation was true. The EEOC issued a right-to-sue letter on this charge also on November 10, 1983, and this suit was timely filed on February 7, 1984. The original complaint was amended to add the class charge on October 3, 1984.

Section 704(a) of Title VII prohibits an employer from "discriminat[ing] against any of his employees ... because [the employee] has ... made a charge under Title VII." 42 U.S.C. § 2000e–3(a) (1982). A prima facie case of retaliatory discharge is made when an employee establishes by a preponderance of the evidence (1) that he or she engaged in an activity protected by Title VII, (2) that an adverse employment

action occurred, and (3) that there was a casual connection between the participation in protected activity and the adverse employment activity. *De Anda v. St. Joseph Hospital*, 671 F.2d 850, 856 (5th Cir.1982). Once plaintiff establishes a prima facie case of retaliation, then defendant must articulate a legitimate non-discriminatory reason for the adverse employment action; if defendant so rebuts, the plaintiff must prove that defendant's reasons were mere pretext for discrimination. *De Anda*, 671 F.2d at 856. *See also Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Recent precedent establishes that a plaintiff charging retaliatory discharge must prove causation-in-fact, or "but for" causation, between the protected activity and the adverse employment decision; that is, plaintiff must show that "but for" the protected activity with the EEOC, he or she would not have been discharged. *Jack v. Texaco Research Center*, 743 F.2d 1129, 1131 (5th Cir.1984). Finally, at this post-trial stage of the proceedings, the duty of the court is not to tie the evidence adduced to the shifting burden analysis of *McDonnell-Douglas* and its progeny. Rather, the court's inquiry focuses on the ultimate factual inquiry of whether the plaintiff was the victim of prohibited conduct. *Jack*, 743 F.2d at 1131. *See also United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1984).

As a general defense to these individual claims, the Company contends that it had no knowledge of the identities of these individual plaintiffs until well over a year after the last of the terminations. The

---

14. Plaintiffs also contend that defendant discriminated in making job assignments. It should be noted initially that this is not a hiring case, *see Ivy v. Meridian Coca-Cola*, 108 F.R.D. 118, 122 (S.D.Miss.1985), and, therefore, initial job assignments are not considered. Plaintiffs' evidence on the alleged discrimination in assignment other than initial hiring focused on testimony regarding work done at the home of Hardy Graham and at the Company's lake property. The court finds that blacks as well as whites, including Graham, worked on these assignments. The testimony also indicated that blacks were responsible for the majority of janitorial work in some departments. Even if the evidence had shown conclusively that blacks were the primary workers in these situations, that is not enough to sustain the class claim.

Company admits that it received notice of the class charge of discrimination on August 3, 1982. Richard James, the Company's secretary-treasurer, also admitted that in the period after receiving such notice the Company attempted to investigate and ascertain the names of the aggrieved employees, but he testified that the effort was unsuccessful. Individual plaintiffs produced no direct evidence that the Company was aware of their EEOC activities prior to their discharge, hence, the applicability of the *McDonnell-Douglas* analysis for purposes of establishing the individual plaintiffs' prima facie cases. Plaintiffs assert that the circumstantial evidence adduced and the inferences to be drawn therefrom establish the requisite causal connection.[15] *See Aikens*, 460 U.S. at 717, 103 S.Ct. at 1482 (plaintiff in employment discrimination case not required to submit direct evidence of discriminatory intent); *Keith v. Computer Sciences Corp.*, 39 FEP Cases 1009 (N.D.Ga.1985) (relative shortness of time between filing of charge and termination sufficient to infer causal connection). The testimony of Hardy Graham, which this court credits, was to the effect that the Company was unaware of the identities of the charging parties prior to the individual plaintiffs' terminations. Other than the fact of termination, the individual plaintiffs adduced no evidence of a credible nature which would indicate that the Company knew of their EEOC activity, and their burden, as stated, was to show that their protected EEOC activity was the cause-in-fact of their terminations. Thus, the court must conclude that the individual claims fail on this basis alone. Assuming, however, that sufficient evidence were to exist in the record to support an inference of retaliatory motive and establish these plaintiffs' prima facie cases, the court is of the opinion that such inference was rebutted, as the Company went further to prove that these individual terminations were effected for legitimate non-discriminatory reasons. The individual claims will be addressed separately.

### 1. *Donnie Ruffin*

■ Ruffin testified that he went to work for the Company in the summer of 1981 and was assigned to an extra sales helper's position in the sales department. His duties involved loading and unloading route trucks at both the plant and at stores. On Friday, August 20, 1982, Ruffin had completed a route run and had assisted the regular helper on that route in loading the truck for the next day's delivery. At approximately 3:30 p.m., just before Ruffin punched out for the day, he was told by the regular helper and Keith Kinney, the supervisor of the load/sort department, to load a second truck for the next day's delivery.[16] Ruffin testified that he had never been instructed to load two trucks in the same day, that the second loading would have made him work overtime in violation of a Company ban on overtime, and that the instructions were given in a joking manner. For whatever reason, Ruffin ignored the instruction and punched out for the day. He was terminated the following Monday, August 23, 1982, for refusing a direct order from a supervisor.

The court is of the opinion that the Company's proffered reason for terminating Ruffin was legitimate and non-discriminatory. Ruffin offered only general, inferential evidence that the Company's reason for

**15.** Specifically, plaintiffs contend that the original class charge filed with the EEOC was the culmination of regular meetings held between various black employees of the Company and Obie Clark of the Meridian NAACP. The meetings began in the spring of 1982 and continued through that fall. Various employees testified that the meetings were non-secretive and that they were openly discussed during working hours at the Company.

**16.** The testimony was disputed as to whether Kinney or Travis Harrison, route sales department supervisor, told Ruffin to load the second truck. The court need not determine which supervisor so instructed Ruffin, since either Kinney or Harrison had supervisory authority to issue the directive which Ruffin undisputedly ignored.

termination was pretextual. Thus, the court must conclude that Ruffin failed to establish the requisite causation-in-fact between his protected EEOC activity and his termination. His individual claim should be dismissed.

### 2. Henry Naylor

■ Naylor began his employment with the Company in August 1974. Throughout his employment Naylor worked on the production line, mainly separating bottles and placing them on the line. Each Monday, however, Naylor was assigned the task of driving a Company truck to area stores to pick up empty bottles. On Monday, October 24, 1982, Naylor was involved in an accident in the Company truck yard when the truck he was driving sideswiped a parked tractor-trailer rig, causing body damage to both vehicles. After the collision, Naylor was waved on by Dayton Jacklin, then the garage supervisor. Shortly thereafter, the accident came to the attention of both Hardy Graham and Larry Cleveland. Naylor was called back from his route for a meeting with Cleveland, whereupon he was terminated for reckless destruction of Company property. Naylor testified that he had never before been involved in an accident with Company vehicles. The Company had no written policy in place mandating termination of employees who destroyed company property; indeed, plaintiff's exhibit 19 lists over twenty employees who had auto accidents in Company vehicles where such employees were at fault but were not terminated.[17]

The testimony at trial was conflicting on the degree of recklessness that attended Naylor's accident. The court is thus faced with two alternative reasons for Naylor's discharge, one legitimate (reckless destruction of property), the other retaliatory and impermissible.[18] While the court would not indicate, in light of the specific statutory proscription against retaliation in Title VII, that the burden on the defendant to show a legitimate reason for termination is as light as that established in Mt. Healthy Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the ultimate burden of proving but-for causation remains with the plaintiff throughout a Title VII retaliatory discharge case. Jack, 743 F.2d at 1131. The court may go behind the proffered reason for the Company's termination of Naylor, but only upon a showing that the proffered reason was mere pretext for discrimination. It is insufficient for plaintiff to show by circumstantial evidence that his protected EEOC activity was a substantial factor contributing to his discharge. Likewise, it is insufficient rebuttal for the employer to argue under Mt. Healthy that it had an alternative, legitimate reason for the employment decision apart from retaliation for the protected conduct if the facts show that the protected conduct was the cause-in-fact of the discharge. Simply put, plaintiff must show that without this retaliation his employment would have continued. Jack, 743 F.2d at 1130–31. Naylor failed to make such a showing. Therefore, the court concludes that his individual claim should be dismissed.

---

17. Richard James testified that other employees who had accidents using Company property also reported the loss responsibly and therefore were not terminated. The court rejects this proffered reason for Naylor's termination in light of the fact that Naylor was waved on by Jacklin following the accident, and was haled from the job by Cleveland and terminated before he had a chance to report the accident.

18. The court would note that the decision to terminate Naylor was reached by Company President Hardy Graham, based upon representations by Jacklin, the Company's only eye wit-

ness to the accident, that Naylor was speeding and refused to stop at the time of the accident. Jacklin is deceased. Thus, Graham's testimony on the reasons underlying his decision to terminate Naylor, otherwise pure hearsay, was admitted for the limited purpose of showing his intent at the time of the termination. The court is of the opinion that Graham, at the time of the termination, was motivated by his belief that Naylor was driving recklessly at the time of the accident, rather than by any retaliatory animus. Naylor failed to prove that Graham's intent was otherwise.

### 3. *Gus Blanks*

█ Blanks had three separate tenures of employment with the Company beginning in 1970. During his last tenure from 1975 to 1982, he worked as a route sales helper before being transferred in 1981 to the position of transport driver. His duties as transport driver included driving large tractor-trailer units to warehouses in outlying cities that were serviced by the Company. As stated previously in this opinion, the Company began negotiating with Profit Management Development, Inc. (PMD) in the spring of 1982 regarding a proposal to study the organizational structure of the Company in anticipation of adopting a plan which would improve Company efficiency and profits. Following a study conducted at the Company facilities by Leo Garibay of PMD, a report was issued which recommended closing the warehouses in outlying cities serviced by the Company and concentrating the operations in the Meridian plant. This recommendation was adopted. As a result, several positions in the Company, including Blanks' transport route, were "cut out." Blanks was terminated on November 2, 1982.

Blanks argues that his termination predated implementation of the PMD report by some months, and that many employees whose positions involved servicing the outlying warehouses, including blacks who did not join in the EEOC charge, were brought in to the Meridian plant and given new duties. The record indicates, however, that four other employees, two whites and two blacks (including individual plaintiff Larry Ivy), were laid off by the Company as a result of the implementation of the PMD recommendations. This supports the Company's contention that the layoffs occasioned by the PMD report were aimed at positions rather than individuals. While proof that implementation of the PMD report caused layoffs only in those positions held by the charging parties could support a finding of pretext, such proof is absent here. Therefore, the court cannot conclude that the reason proffered by the Company was mere pretext for impermissible conduct. By the same token, the court concludes that Blanks failed to establish that his participation in the EEOC charge was the cause-in-fact of his termination. His individual claim should be dismissed.

### 4. *Larry Ivy*

█ Ivy was employed by the Company from 1978 until his termination in 1982. He was stationed in the production department throughout his employment, performing various tasks including bottle sorting, cleaning up and hauling trash. Pursuant to the PMD report, the bottle sorting function was transferred from the production department to the loading and sorting department within the plant. Subsequently, the bottle sorting function was transferred to the route sales helpers for performance on the route trucks. Ivy was terminated on November 9, 1982 because, he was told, his position was being abandoned by the Company.

Ivy asserts that his termination differs from Blanks' termination in the following respects: the bottle-sorting function was not abandoned but transferred to another department; Ivy was never offered any of the various bottle-sorting or route sales helper jobs that have come open since his termination; the PMD report containing the proposed reorganization of plant functions, and upon which the Company allegedly relied in terminating Ivy, in fact, recommended Ivy as one of the bottle sorters in a new department or that he be retained in the production department. In addition to the reasons stated above with regard to Blanks' claim, the court does not consider the PMD report to have foreclosed the Company from exercising discretion in the manner and extent to which the report would be implemented. Ivy's case was not the only instance in which the Company accepted PMD's recommendation on certain aspects of Company functions and ignored it as to others. The Company's asserted reliance on the PMD report is weakened to some extent by the fact that it accepted the PMD recommendations on restructuring

the bottle-sorting function but departed from the recommendations as to Ivy's employment. The burden remained with Ivy, however, to show that, but for his protected activity, his employment would have continued. The court concludes that Ivy failed to sustain this burden. Thus, his individual claim should be dismissed.

The court would reiterate that the findings of fact and conclusions of law reached herein regarding these individual claims of retaliatory discharge do not moot these individuals' claims for class-wide relief. See *Ivy v. Meridian Coca-Cola Bottling Co.*, 108 F.R.D. 118, 125–26 (S.D.Miss.1985), and the cases cited therein. The class claims relate to alleged discriminatory treatment in employment practices occurring while the plaintiff class members were employed by the Company and not to discrimination in the discharge of any individual class members. *Id.* at 124 n. 16. Ruffin, Naylor, Blanks and Ivy are allowed to represent the class and participate in any class-wide relief to which they can prove they are entitled when a trial on damages is conducted in phase two of this litigation.

## CONCLUSION

The court is, therefore, of the opinion that plaintiffs have established that defendant discriminated in its promotion practices in violation of Title VII. Plaintiffs' other class claim and the claims of the individual plaintiffs should be dismissed. The Court would anticipate an expedited trial scheduling with reference to the Phase II, damages portion of this litigation. In the interim, the parties should confer regarding the possibilities of settlement and the drafting and adoption of a consent decree incorporating appropriate equitable relief sanctioned by Title VII. Within ten days of the issuance of this opinion, the parties should confer and report to the court the possibilities of or progress with reference to a settlement. A separate order conforming with this opinion shall be entered according to the local rules.